**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| BC IMMIGRATION FUND LLC f/k/a THREE | : | |
| STREAMS RADIUS, LLC, and BREVET | : | |
| ASSET SOLUTIONS, LLC | : | Case No. |
| Plaintiffs | : | |
| v. | : | |
| | : | |
| VETRO BUILDING ENVELOPE, LLC, | : | |
| JEFFREY JENNINGS, and ARTHUR | : | |
| BURKINDINE, JR. | : | |
| | : | |
| Defendants | | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs BC Immigration Fund LLC f/k/a Three Streams Radius, LLC ("BCIF") and Brevet Asset Solutions, LLC ("BAS"), by and through their undersigned counsel, hereby bring this action against Defendants Vetro Building Envelope, LLC ("Vetro"), Jeffrey Jennings ("Jennings") and Arthur Burkindine, Jr. ("Burkindine").

### THE PARTIES

1.      Plaintiff BCIF is a citizen of the State of New York by way of its sole member being a citizen of New York.

2.      Plaintiff BAS is a citizen of the State of New York by way of its sole member being a citizen of New York.

3.      Defendant Vetro is a citizen of the State of Maryland because its two members, Defendant Jennings and Defendant Burkindine, are citizens of Maryland.

### JURISDICTION AND VENUE

4.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because:

a.      diversity of citizenship exists between Plaintiffs and Defendants; and

   b.    the matter in controversy exceeds, exclusive of interest and costs, the sum
         of seventy-five thousand dollars ($75,000).

5.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because many of the events,

misrepresentations and omissions giving rise to the claims at issue herein occurred in this judicial

district.

6.    Additionally, Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the

Credit and Security Agreement and Amended and Restated Guarantee and Pledge Agreement

that are at issue were made from New York and designate New York as the jurisdiction for any

claim or controversy relating to these agreements, as defined below.

7.    There also have been several meetings between Plaintiffs and Defendants at

Plaintiffs' office in this district that related to the subject matter of this action.

**FACTS**

**<u>Background</u>**

8.    Plaintiff BCIF is a debt fund that loans money to businesses in connection with a

federal program facilitating foreign investment in the United States.  In connection with that

federal program, it has loaned funds to non-party K-4 Associates, LLC ("K-4"), which funds are

at issue in this litigation.

9.    Plaintiff BAS is a special purpose management company that provides certain

management services to BCIF and other affiliated companies.  Pursuant to that certain

Preliminary Agreement, dated March 23, 2016, BAS has been appointed as attorney-in-fact of

BCIF, in addition to non-party Brevet Direct Lending – Short Duration Fund, L.P. ("Brevet

Direct Lending") and other affiliated entities, for purposes of, among other things, taking certain

actions and protecting certain of their interests that are at issue in this litigation.

10.     Non-party Brevet Direct Lending is a debt fund and investment manager that provides financing solutions to small and mid-size companies across a wide range of industries. It is affiliated with Plaintiff BCIF and may provide money to BCIF for deployment from time to time.

11.     Collectively, Plaintiffs BCIF and BAS are referred to hereafter as "Brevet" unless otherwise indicated.

12.     Non-party K-4 is a construction contractor and real estate developer.

13.     K-4 is in the business of forming wholly owned or controlled operating subsidiaries specializing in various trades that support K-4's construction and real estate development business, including the design, engineering, fabrication, and installation of windows in commercial, industrial and residential buildings.

14.     K-4's business address is 649b Lofstrand Lane, Rockville, Maryland.

15.     Defendant Vetro holds itself out as a subcontractor that specializes in the design, engineering, fabrication, and installation of windows in commercial, industrial and residential buildings.

16.     Defendant Jennings has held himself out as the Chief Executive Officer ("CEO") and Managing Member of Vetro.

17.     Defendant Burkindine has held himself out as the President of Vetro, and Member of Vetro.

18.     Until May 2016, Jennings was the Chief Operating Officer ("COO") of K-4.

19.     Until May 2016, Burkindine was an employee of K-4.

## In 2014, Jennings and Burkindine Secretly Incorporated Vetro

20.     On October 23, 2014, Jennings, then an executive officer of K-4, and Burkindine, a former employee of K-4, executed an operating agreement purporting to form "Vetro Building Envelope, LLC" (the "October 23, 2014 Operating Agreement").

21.     The October 23, 2014 Operating Agreement states that Vetro is owned by Jennings (99%) and by Burkindine (1%), and states that Jennings is the Managing Member.

22.     On November 26, 2014, Jennings and Burkindine filed articles of organization for Vetro with the Maryland Department of Assessments and Taxation.

23.     Jennings and Burkindine executed the October 23, 2014 Operating Agreement and filed articles of organization for Vetro while employed by K-4 (and, with respect to Jennings, while serving as an officer of K-4), despite the fact that K-4 was in the same business of forming operating entities specializing in the various construction trades, such as window installation.

24.     At the time of the events set forth herein, Vetro's articles of organization stated that Vetro's address was 649b Lofstrand Lane, Rockville, Maryland.

25.     649b Lofstrand Lane, Rockville, Maryland is K-4's address and has been K-4's address since at least 2013.

26.     Upon information and belief, Jennings and Burkindine did not inform K-4 executives that they were executing an operating agreement for Vetro, that they were asserting exclusive ownership rights with respect to Vetro, or that they were filing articles of organization for Vetro.

## K-4's Business Plans, Prepared In Part By Jennings, Represent That Vetro Is Owned And Controlled By K-4

27.     In the spring of 2015, in anticipation of obtaining financing for operations, K-4 updated and memorialized its business plan in a document titled "K-4 Associates, LLC Business Plan April 2, 2015" (the "2015 Business Plan"). The 2015 Business Plan was prepared in significant part by Jennings, acting in his capacity as K-4's COO.

28.     The 2015 Business Plan contemplated that K-4 would obtain construction and real estate development contracts and would form wholly owned operating companies to perform the trade work under the contracts.

29.     The 2015 Business Plan contained several exhibits contemplating the formation of specific trade subsidiaries and provided projected income and cash flow statements for the first three years of each such subsidiary's operation.

30.     One of the subsidiaries that the 2015 Business Plan described was the "K-4 Design-Build Group – Commercial Window Installation Division," which was a reference to Vetro.

31.     Pursuant to its 2015 Business Plan, K-4 also formed the following operating companies to serve its business: K-4 Architecture & Engineering, LLC, K-4 Contractors, LLC and K-4 Restoration, LLC.

32.     On August 1, 2015, K-4 executed an operating agreement in the name of Vetro Building Envelope, LLC, which states that "Vetro Building Envelope, LLC" was formed on August 1, 2015 (hereafter the August 2015 Operating Agreement").

33.     K-4 executed the August 2015 Vetro Operating Agreement because K-4's executives understood that the Vetro entity was intended to be K-4's "commercial window installation division" as contemplated in the 2015 Business Plan.

- 5 -

34.     The August 2015 Operating Agreement stated that K-4 was the sole member of Vetro.

35.     In 2016, K-4 updated its business plan (the "2016 Business Plan").

36.     Just as he had been heavily involved in the preparation of the 2015 Business Plan, Jennings was heavily involved in the preparation of the 2016 Business Plan in his capacity as K-4's COO.

37.     Consistent with the 2015 Business Plan, the 2016 Business Plan stated that K-4 operates through its "wholly owned companies [ ] engaged in the construction industry."

38.     The 2016 Business Plan expressly listed "Vetro Building Envelope, LLC" as a "commercial window installation" operating company wholly owned by K-4.

39.     Upon information and belief, Jennings did not inform K-4's other executives that he and Burkindine purportedly owned Vetro, even though Jennings helped K-4 prepare the 2015 and 2016 Business Plans that referred to K-4's ownership of Vetro.

40.     Upon information and belief, at all times during the events described above, the K-4 executives other than Jennings and Burkindine did not know that Jennings and Burkindine already had purported to form a window installation company called "Vetro" and already had declared themselves to be its owners, with K-4 having no ownership interest.

### K-4 Obtains Financing from Brevet

41.     In 2015, to help grow its business and finance certain capital expenditures, K-4 sought financing from Brevet.

42.     In 2015, the following loans and associated agreements were entered into by Brevet and K-4:

    a. **Loan Agreement**, dated March 20, 2015, in the amount of $12,000,000 between K-4 Philadelphia, LLC (as Borrower), FCS Advisors LLC (as Administrative Agent) and Brevet Direct Lending (hereafter the "Loan Agreement"), which was to finance the acquisition of certain property and for other capital costs;

    b. **Guarantee and Pledge Agreement**, dated March 20, 2015, among K-4 Associates, LLC and Jeffrey B. Kozero (as Guarantors and Grantors), and FCS Advisors LLC (as Administrative Agent, for the benefit of Brevet Direct Lending) in connection with the above referenced Loan Agreement;

    c. **Credit and Security Agreement**, dated June 19, 2015, among K-4 Associates, LLC (as Borrower), Three Streams Radius, LLC n/k/a BCIF (as Lender) and FCS Advisors LLC (as Loan Servicer) (hereafter the "Credit and Security Agreement"), in the amount of $5,750,000, which was to provide K-4 with operating capital.  The Credit and Security Agreement provided that, as collateral for the loan, K-4 granted Plaintiff BCIF a lien and secured interest in K-4's assets, including its bank accounts;

    d. **Guarantee and Pledge Agreement**, dated June 19, 2015, among Three Streams Radius, LLC n/k/a BCIF (as Lender), K-4 Philadelphia, LLC and Jeffrey B. Kozero (as Guarantors and Grantors), and FCS Advisors LLC (as Loan Servicer) (hereafter the "Guarantee and Pledge Agreement"), made in connection with the Credit and Security Agreement;

    e. **Master Bridge Loan and Security Agreement**, dated June 19, 2015, among Brevet Direct Lending (as Lender) and Three Streams Radius, LLC n/k/a BCIF (as Borrower), pursuant to which Brevet Direct Lending would provide bridge financing to BCIF and to certain other entities, including K-4.

- 7 -

f.  **Limited Guarantee**, dated October 15, 2015, among Jeffrey B. Kozero

(individually as Guarantor), in favor of Brevet Direct Lending (as Lender) and FCS

Advisors LLC (as Master Servicer), in connection with the Master Bridge Loan and

Security Agreement.

43.     Also effective June 19, 2015, K-4 amended its operating agreement (the

"Amended and Restated Operating Agreement"), in part to provide that K-4 shall not take any

action that constitutes a "Major Decision," as that term is defined in the Amended and Restated

Operating Agreement, without the consent of BCIF.

44.     The Amended and Restated Operating Agreement stated that K-4's sole

indebtedness was the "Brevet Loan."

45.     The Amended and Restated Operating Agreement defines "Brevet Loan" as

follows:

> "Brevet Loan" mean[s], collectively, the loans made by (i) Three Streams
> Radius to the Company or any of its Subsidiaries, including pursuant to that
> certain Credit and Security Agreement by and between Three Streams Radius,
> LLC and the Company, (ii) Brevet Lender or any of its Affiliates to Three
> Streams Radius or any of its respective Affiliates, including pursuant to that
> certain Master Loan and Security Agreement, by and among Three Streams
> Radius, Brevet Lender and the other party signatories thereto, dated as of the
> Effective Date [June 19, 2015]….

46.     The Amended and Restated Operating Agreement defines the "Brevet Lender" as

Brevet Direct Lending.

## Brevet Provides Additional Financing Related to
## The MGM Casino Contract

47.     In October of 2015, Vetro entered into a contract with Gamma USA, Inc. to

install windows at a construction project known as the MGM Casino at the National Harbor, a

$1.3 billion project including a luxury hotel, resort and casino (hereafter the "MGM Casino Contract").

48.     As contemplated in the 2015 and 2016 Business Plans, Brevet and K-4 believed and understood that Vetro was K-4's wholly-owned subsidiary, and that the MGM Casino Contract was to be performed by Vetro for K-4's benefit.

49.     At the time the MGM Casino Contract was entered into, Brevet and K-4 executives other than Jennings were unaware that Jennings and Burkindine already had executed the October 23, 2014 Operating Agreement and filed articles of organization for Vetro declaring that they owned Vetro.

50.     To obtain additional financing in connection with the MGM Casino Contract and to fund its windows installation business, K-4 sought and obtained the following amendments to the Brevet Loan:

     a.     Effective November 11, 2015, the Credit and Security Agreement was amended ("Amendment No. 1") to increase the Brevet Loan to $7,750,000.

     b.     Effective December 3, 2015, the Credit and Security Agreement was again amended ("Amendment No. 2") to increase the Brevet loan to $9,250,000.

     c.     Effective December 3, 2015, K-4, Vetro and BCIF entered into an Amended and Restated Guarantee and Pledge Agreement (hereafter the "Amended Guarantee"), pursuant to which K-4 and Vetro guaranteed payment of the Credit and Security Agreement and Amendment Nos. 1 and 2 thereto.

51.     Pursuant to Amendment Nos. 1 and 2, the Credit and Security Agreement was increased by $3,500,000, the increase being intended to provide K-4 necessary financing for Vetro to perform under the MGM Casino Contract.

52.     Only approximately $3,100,000 of the $3,500,000 was actually drawn by K-4.

53.     $2,000,000 of the $3,100,000 was designated to support a performance bond in connection with the MGM Casino Contract.

54.     Amendment No. 1 to the Credit and Security Agreement contains a covenant by K-4 to maintain the $2,000,000 to support the performance bond in a designated bank account with EagleBank ("the EagleBank Account"), which was to be monitored by a third party.

55.     The EagleBank Account was to be in the name of "Vetro Building Envelope LLC," which Plaintiffs and, upon information and belief, K-4, understood to be the window installation company that K-4 had created on August 1, 2015 and wholly owned, and which K-4 expressly referenced in its 2015 and 2016 Business Plans.

56.     Matthew Wagner, the Chief Financial Officer ("CFO") of K-4, was a signatory on the EagleBank Account.

57.     In addition to the performance bond monies, the performance of the MGM Casino Contract required operating capital.

58.     The remaining $1,100,000 of the $3,100,000 in additional funds that BCIF loaned to K-4 was also held in a Vetro account as working capital for the MGM Casino Contract.

59.     During the time the Brevet Loan and the amendments thereto were issued, Brevet had been provided with the August 2015 Operating Agreement and the 2016 Business Plan, both showing that Vetro was wholly-owned by K-4, leading Brevet to believe that the additional loaned funds would ultimately be controlled by K-4.

**Leading Up To the Issuance of the Brevet Loan and Amendments Thereto, Jennings
Intentionally Misled Brevet Regarding the Ownership of Vetro**

60. During the negotiations of the Brevet Loan, Jennings, in his capacity as COO of
K-4, intentionally misled Brevet and caused it to believe that K-4 had a windows installation
division or wholly-owned windows installation subsidiary known as Vetro Building Envelope,
LLC.

61. Jennings met with representatives of Brevet in New York City for purposes of
inducing Brevet to lend additional money to K-4 in connection with the MGM Casino Contract,
pursuant to which Vetro was to perform windows installation work.

62. Jennings was aware that the August 2015 Operating Agreement, which stated that
K-4 was the sole owner of Vetro, was provided to representatives of Brevet.

63. Jennings and Burkindine operated Vetro using K-4 employees, who were all on
K-4's payroll until May of 2016. These K-4 employees included, without limitation, Donald
Taylor, Deborah Gladstone, Patricia Harris and Allen Gordish. These employees are now
employed by Jennings and Burkindine.

64. Accordingly, Jennings and Burkindine operated Vetro as if it were K-4's
company, using K-4 employees, who were paid by K-4 using the operating funds from the
Brevet Loan.

65. In so doing, Jennings and Burkindine created the appearance that they were
operating Vetro for K-4's benefit.

66. At no time during the loan issuance period was Brevet informed that Jennings and
Burkindine were asserting exclusive ownership rights with respect to Vetro, or that they had filed
articles of organization for Vetro.

67.     Based upon the foregoing, it was always Brevet's understanding that the funds loaned would be ultimately controlled solely by K-4, and that the revenue from Vetro's contracts would be controlled by K-4 and available to repay the Brevet Loan.

68.     Brevet relied on this understanding, induced by Jennings' and Burkindine's representations and/or conduct, in agreeing to issue the Brevet Loan and amendments thereto.

69.     Accordingly, Jennings and Burkindine fraudulently induced Brevet to issue the Brevet Loan to K-4, which Jennings and Burkindine intended to siphon off for their own benefit.

### Jennings and Burkindine Claim to Own Vetro, Transfer the EagleBank Account to Themselves and Defect from K-4

70.     In February 2016, Jennings attempted to amend the August 2015 Operating Agreement by way of a proposed "First Amendment of Amended and Restated Limited Liability Operating Agreement of Vetro Building Envelope, LLC."

71.     The amendments that Jennings sought to make would remove K-4 as the Managing Member of Vetro, would transfer all of K-4's interest in Vetro to Jennings, and would designate Jennings as the Managing Member of Vetro.

72.     By way of these amendments, Jennings would reconcile the August 2015 Operating Agreement with the October 23, 2014 Operating Agreement that he secretly had executed with Burkindine, thereby removing the later August 2015 Operating Agreement as an obstacle to his purported ownership of Vetro.

73.     Jennings' proposed amendments provided that "[t]he transfer of the interest is dependent on the approval of Brevet Capital."

74.     Jennings presented the proposed amendments to Brevet for approval in the latter half of February 2016.

75. Brevet was shocked and dismayed to learn that Jennings claimed an ownership interest in Vetro and refused to approve of the amendments.

76. A few weeks later, having been denied permission to transfer Vetro's ownership, Jennings opened an account with M&T Bank on March 10, 2016 in the name of "Vetro Building Envelope LLC" (the "M&T Account").

77. Upon information and belief, Jennings represented to K-4 that he had a relationship with M&T Bank and wanted to grow the relationship with M&T Bank for K-4's benefit by transferring Vetro's accounts from EagleBank to M&T.

78. There were three signatories on the new M&T Account: (1) Matthew Wagner (K-4's CFO); (2) Donald Taylor (K-4's Controller, who was simultaneously working for Jennings at Vetro) and (3) Jennings.

79. By being a signatory to the account, Wagner had authority to control the account on behalf of K-4.

80. On or about March 21, 2016, unbeknownst to Wagner and other K-4 executives, Jennings removed Wagner from the M&T Account, leaving himself and his cohort, Donald Taylor, in sole control of the account.

81. In addition, on or about March 21, 2016, Jennings used his position as COO of K-4 to transfer the funds held in the EagleBank Account to the M&T Account, which he now exclusively controlled with his cohort Donald Taylor. The funds transferred consisted of the $2,000,000 portion of the Brevet Loan designated to support the performance bond for the MGM Casino Contract and what remained of the $1,100,000 in working capital provided by the Brevet Loan.

82.     On March 31, 2016, the third party entity responsible for monitoring the EagleBank Account contacted Wagner and inquired what happened to the funds that were to be maintained in the EagleBank Account pursuant to K-4's covenant in Amendment No. 1 to the Credit and Security Agreement.

83.     Wagner forwarded the inquiry to Donald Taylor, who informed the monitoring entity that the funds had been transferred to the M&T Account.

84.     Donald Taylor, however, surreptitiously withheld from both Wagner and the monitoring entity the fact that Wagner had been removed from the M&T Account and, as a result, K-4 no longer had control over that account.

85.     Brevet did not learn about the improper transfer of their loan proceeds from EagleBank to M&T Bank, which violated Amendment No. 1, until late April 2016.

86.     Shortly thereafter in May of 2016, Jennings, Burkindine, Donald Taylor, Deborah Gladstone, Patricia Harris and Allen Gordish – all K-4 employees who had been operating Vetro while employed with K-4 – terminated their employment with K-4 and declared themselves employees of Vetro, which now exclusively controlled the portion of the Brevet Loan taken from K-4 and transferred to the M&T Account.

87.     Through the above acts of disloyalty and self-dealing, Jennings and Burkindine fraudulently and wrongfully converted K-4's funds from the Brevet Loan, which funds were also a portion of Brevet's collateral for the Brevet Loan.

88.     In addition, by secretly making themselves purported owners of Vetro, Jennings and Burkindine fraudulently schemed to convert and divert the Brevet Loan funds to themselves.

- 14 -

89.     Furthermore, any profits Vetro receives from the MGM Casino Contract and all other contracts will not be distributed to K-4 and thus will not be available to repay the Brevet Loan or function as collateral for the Brevet Loan.

90.     Defendants have thus fraudulently obtained funds and property in which Brevet has an interest, thereby improperly interfering with Brevet's rights respecting such funds and property.

91.     In addition, Defendants have unjustly enriched themselves by absconding with $3,100,000 that Brevet loaned to K-4 and transferring those funds to Vetro bank accounts, which they purport to control, in exchange for nothing and under false pretenses, while leaving K-4 with the obligation to repay the Brevet Loan.

92.     Defendants' wrongful acts have negatively impacted K-4's ability to perform under the Credit and Security Agreement and its amendments between BCIF and K-4, thereby tortiously interfering with this agreement to Brevet's detriment.

### Jennings Embezzled, Converted, Wasted and/or Misappropriated Assets Belonging to K-4

93.     Brevet learned that Jennings, while an officer of K-4 and prior to his defection from K-4, embezzled and misappropriated a portion of collateral for the Brevet Loan by diverting K-4 funds for his own personal use.

94.     By way of example, but not limitation, Brevet learned that Jennings took the following unauthorized actions:

a.     Jennings made an unauthorized transfer of $75,000 of K-4's funds to Absolute Controls, a company owned by Jennings, on July 2, 2015;

b.     Jennings improperly and without authority tripled his own salary from approximately $3,557.70 per week to $9,134.63 per week for several months, in breach of the Credit and Security Agreement;

    c.      Jennings made personal unauthorized purchases in excess of $50,000 on K-4's American Express card;

    d.      Jennings made an unauthorized purchase of a boat for his personal use in the amount of $33,000 and paid associated slip fees of $4,747 using K-4 funds;

    e.      Jennings improperly used K-4 funds to pay rent and a security deposit for his personal residence in the amount of $14,195; and

    f.      Jennings improperly used K-4 funds to purchase a personal mountain bike and accessories, surfing equipment, clothing and home furnishings, among other personal expenses, in excess of $10,000.

**Defendants Breached an Agreement in Principle to Resolve Plaintiffs' Claims**

95.    Jennings has represented to Brevet that in 2016, he and Vetro successfully bid on a windows contract for a large construction project, referred to as the "Clark Construction Project."

96.    Jennings has represented to Brevet that in order to finalize the contract, Vetro would have to post a performance bond and that the bonding company would require confirmation that Jennings owned a controlling interest in Vetro.

97.    Jennings approached Brevet and K-4 in May or June of 2016 seeking a representation to the bonding company to that effect.

98.    Brevet has the contractual right to prevent K-4 from taking such an action without Brevet's approval.

99.    In June of 2016, Brevet, K-4 and Jennings negotiated an agreement whereby Vetro would obligate itself to repay the $3,100,000 that Defendants improperly diverted. Under the agreement, Brevet and K-4 would stipulate that Jennings owned Vetro, but Vetro would

repay the stolen funds, and Jennings personally would guaranty Vetro's performance. Essentially, the parties agreed that the amounts that Jennings had taken would be treated as a secured loan from K-4 to Vetro, to be repaid over a certain term, with interest and other consideration.

100.    During the negotiations over the new loan agreement, Jennings traveled to Brevet's office in New York City to discuss and negotiate the terms of the agreement.

101.    On June 27, 2016, Jennings and K-4 signed a representation acknowledging that Vetro had committed to certain repayment terms under a defined debt structure and payment plan.

102.    Within days of signing the representation, however, Jennings reneged on his promise to treat the $3,100,000 as debt and insisted that, instead, he would do no more than transfer a minority equity interest in Vetro to K-4.

103.    Jennings has breached the agreement that was partially memorialized in the representation dated June 27, 2016.  He, Burkindine and Vetro are continuing to misappropriate K-4 assets, which are Brevet's collateral for the Brevet Loan.

### COUNT I
### FRAUDULENT INDUCEMENT
### (Plaintiffs v. Defendants)

104.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

105.    At all relevant times, Defendants intentionally misrepresented and led Plaintiffs to believe that Vetro was a wholly owned and controlled subsidiary or division of K-4.

106.    Defendants knew that their misrepresentations were false when made.

- 17 -

107.    At all relevant times Defendants knowingly allowed Plaintiffs to believe that Vetro was a wholly owned and controlled subsidiary or division of K-4, that they were acting in K-4's interests, and that K-4's and Vetro's interests were aligned.

108.    Defendants' representations and conduct were made with the intention that Plaintiffs would rely on same with respect to the Brevet Loan made to K-4 in June 2015, and amended in November and December of 2015 in connection with the MGM Casino Contract.

109.    Defendants' representations and conduct were made with the intention to induce Plaintiffs to loan funds to K-4, which Defendants knew were designated to support a performance bond and provide operating capital to Vetro to perform under the MGM Casino Contract.

110.    The foregoing misrepresentations and misleading conduct were material because Plaintiffs did in fact rely on same, to their detriment, in agreeing to provide a $9,250,000 loan to K-4, a portion of which Defendants misappropriated.

111.    Plaintiffs justifiably and actually relied on Defendants' material misrepresentations and misleading conduct regarding K-4's ownership and control of Vetro.

112.    As a result of Defendants' misrepresentations and misleading conduct, Plaintiffs have suffered damages.

**WHEREFORE**, Plaintiffs respectfully request that this Court:

(a)    enter judgment in their favor against Defendants in an amount to be determined at trial;

(b)    award injunctive relief, preventing Defendants from using or disposing of Plaintiffs' collateral and assets in which they hold a secured or other interest;

- 18 -

(c)     award punitive damages;

(d)     award pre- and post-judgment interest, costs, and attorneys' fees; and

(e)     award any other relief this Court deems just and appropriate.

## COUNT II
## CONVERSION
### (Plaintiffs v. Defendants)

115.     Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

116.     Defendants improperly and intentionally exercised ownership and dominion over millions of dollars of funds and assets in which Plaintiffs hold a secured and/or other interest and which serve as collateral for the Brevet Loan, including by absconding with approximately $3,100,000 of the Brevet Loan.

117.     Defendants secretly took steps to allow them to assert ownership and control of Vetro and then deposited Vetro's funds, which were provided to Vetro by K-4 from the Brevet Loan, into bank accounts controlled by Jennings and Burkindine.

118.     In addition, Jennings intentionally exercised ownership and dominion over funds and assets belonging to K-4, in which Plaintiffs hold a secured and/or other interest and which are collateral for the Brevet Loan, by using his position as an executive of K-4 during the relevant time to give himself an unauthorized and exorbitant raise, make unauthorized personal purchases, and pay personal expenses and debt.

119.     Defendants' exercise of control over assets in which Plaintiffs have a secured and/or other interest, and which constitute collateral to the Brevet Loan, improperly interferes with, dilutes and wastes Plaintiffs' rights to and interest in same.

120.     Defendants' actions were in bad faith.

121.    Defendants had actual knowledge of the wrongfulness of their conduct and the certainty that injury or damage to Plaintiffs would result.  Despite that knowledge, Defendants intentionally pursued that course of conduct, resulting in injury to Plaintiffs.

122.    As a direct and proximate result of Defendants' conversion, Plaintiffs have been harmed and damaged in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs respectfully request that this Court:

(a)    enter judgment in their favor against Defendants in an amount to be determined at trial;

(b)    award injunctive relief, preventing Defendants from using or disposing of Plaintiffs' collateral and assets in which they hold a secured and/or other interest, and requiring turnover of such assets;

(c)    award punitive damages;

(d)    award pre- and post-judgment interest, costs, and attorneys' fees; and

(e)    award any other relief this Court deems just and appropriate.

## COUNT III
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Plaintiffs v. Defendants)

123.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

124.    Defendants intentionally and willfully exercised ownership and dominion over millions of dollars of funds and assets in which Plaintiffs hold a secured and/or other interest, and which serve as collateral for the Brevet Loan.

125.    Defendants' conduct is wrongful and constitutes fraud and conversion.

126.     Defendants' conduct is intentional and unjustified, and calculated to cause damage to Plaintiffs' lawful business.

127.     Defendants' wrongful acts have negatively impacted K-4's ability to perform under the Credit and Security Agreement and its amendments between BCIF and K-4, thereby tortuously interfering with this agreement to Plaintiffs' detriment.

128.     As a result of Defendants' conduct, Plaintiffs have sustained damages.

**WHEREFORE**, Plaintiffs respectfully request that this Court:

(a)     enter judgment in their favor against Defendants in an amount to be determined at trial;

(b)     award injunctive relief, preventing Defendants from using or disposing of Plaintiffs' funds or collateral, and requiring turnover of such assets;

(c)     award punitive damages;

(d)     award pre- and post-judgment interest, costs, and attorneys' fees; and

(e)     award any other relief this Court deems just and appropriate.

## COUNT IV
## UNJUST ENRICHMENT
### (Plaintiffs v. Defendants)

129.     Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

130.     Plaintiffs conferred a benefit on K-4 in the form of the Brevet Loan.

131.     Plaintiffs had a reasonable expectation that the Brevet Loan would be repaid and, additionally, to receive a return on investment in the way of interest.

132.     Plaintiffs hold a secured and/or other interest in the accounts in which K-4 maintained the funds loaned pursuant to the Brevet Loan and its amendments.

133.    Defendants purported to take ownership of Vetro, the business of which was established using funds from the Brevet Loan, in exchange for nothing.

134.    Defendants caused funds from the Brevet Loan to be transferred to their own company, Vetro, in exchange for nothing.

135.    Defendants were aware that they received a benefit from the Brevet Loan.

136.    In addition, Jennings, using his position as an officer of K-4, improperly received, retained, and used funds from the Brevet Loan to K-4 for his own personal use and benefit.

137.    Defendants therefore were unjustly enriched by improperly taking control over assets of K-4, in which Plaintiffs hold a secured and/or other interest, without exchanging or conferring any benefit to K-4 or Plaintiffs.

**WHEREFORE**, Plaintiffs respectfully request that this Court:

(a)    enter judgment in their favor against Defendants in an amount to be determined at trial;

(b)    award injunctive relief, preventing Defendants from using or disposing of Plaintiffs' funds or collateral, and requiring turnover of such assets;

(c)    impose a constructive trust on all funds in the M&T Account and other bank accounts held by Vetro;

(d)    award punitive damages;

(e)    award pre- and post-judgment interest, costs, and attorneys' fees; and

(f)    award any other relief this Court deems just and appropriate.

## COUNT V
## BREACH OF CONTRACT—AGREEMENT TO REPAY FUNDS
### (Plaintiffs v. Jennings and Vetro)

138.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

139.    Jennings, on behalf of Vetro and himself, entered into an agreement with Plaintiffs and K-4 to repay the $3,100,000 that Vetro improperly obtained from K-4.

140.    Jennings has now stated that Vetro will not honor that agreement.

141.    Accordingly, Jennings and Vetro have breached or committed an anticipatory breach of the aforementioned agreement.

142.    Jennings' and Vetro's breach has caused damages to Plaintiffs.

**WHEREFORE**, Plaintiffs respectfully request that this Court:

(a)    enter judgment in their favor against Defendants in an amount to be determined at trial;

(b)    award injunctive relief, preventing Defendants from using or disposing of Plaintiffs' funds or collateral, and requiring turnover of such assets;

(c)    award punitive damages;

(d)    award pre- and post-judgment interest, costs, and attorneys' fees; and

(e)    award any other relief this Court deems just and appropriate.

## COUNT VI
## BREACH OF CONTRACT—AMENDED GUARANTEE
### (Plaintiffs v. Vetro)

143.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

144.     As stated above, BCIF, FCS Advisors LLC, K-4 Philadelphia, LLC, Vetro and Kozero entered into the Amended Guarantee, under which K-4 Philadelphia, LLC, Vetro and Kozero agreed to guarantee the obligations that K-4 had undertaken in the Credit and Security Agreement.

145.     As set forth in the Amended Guarantee, Vetro expressly agreed to guarantee K-4's obligations in the Credit and Security Agreement "jointly and severally, absolutely, unconditionally and irrevocably, as a primary obligor and not only a surety…."

146.     At the time Vetro entered into the Amended Guarantee, it was Plaintiffs' understanding that Vetro and its representative had authority and apparent authority to do so.

147.     The amount due under the Credit and Security Agreement is $14,672,248 and growing every month due to accruing interest.

148.     K-4 has defaulted and may default in the future on the Brevet Loan, which includes the loans issued pursuant to the Credit and Security Agreement, and which may require Plaintiffs to look to the guarantors of the loan pursuant to the Amended Guarantee for payment.

149.     Vetro has stated and represented that it regards its Amended Guarantee as unenforceable.

150.     Accordingly, Vetro has breached or committed an anticipatory breach of the Amended Guarantee.

151.     Vetro's breach and/or anticipatory breach has caused and/or will cause damages to Plaintiffs.

**WHEREFORE**, Plaintiffs respectfully request that this Court:

(f)     enter judgment in their favor against Defendants in an amount to be determined at trial;

(g)     award injunctive relief, preventing Defendants from using or disposing of Plaintiffs' funds or collateral, and requiring turnover of such assets;

(h)     award punitive damages;

(i)     award pre- and post-judgment interest, costs, and attorneys' fees; and

(j)     award any other relief this Court deems just and appropriate.

### COUNT VII
### DECLARATORY JUDGMENT—AMENDED GUARANTEE
### (Plaintiffs v. Vetro)

152.     Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

153.     As set forth in the Amended Guarantee, Vetro agreed to guarantee the obligations undertaken by K-4 in the Credit and Security Agreement "jointly and severally, absolutely, unconditionally and irrevocably, as a primary obligor and not only a surety…."

154.     At the time Vetro entered into the Amended Guarantee, it was Plaintiffs' understanding that Vetro and its representative had authority and apparent authority to do so.

155.     The amount due under the Credit and Security Agreement is $14,672,248 and growing every month due to accruing interest.

156.     K-4 has defaulted and may default in the future on the Brevet Loan, which includes the loans issued pursuant to the Credit and Security Agreement, and which may require Plaintiffs to look to the guarantors of the loan pursuant to the Amended Guarantee for payment.

157.     Vetro has stated and represented that it regards its Amended Guarantee as unenforceable.

158.     By reason of the foregoing, there is a justiciable case or controversy respecting whether the Amended Guarantee and Vetro's obligations therein are enforceable.

159.    Accordingly, Plaintiffs seek a declaration that the Amended Guarantee and Vetro's obligations therein are enforceable as to Vetro.

**WHEREFORE**, Plaintiffs respectfully request that this Court:

(k)    enter judgment in their favor against Defendants declaring that the Amended Guarantee is enforceable as to Vetro;

(l)    award injunctive relief, preventing Vetro from repudiating its obligations under the Amended Guarantee;

(m)    award pre- and post-judgment interest, costs, and attorneys' fees; and

(n)    award any other relief this Court deems just and appropriate.

## REQUEST FOR JURY TRIAL

Plaintiff hereby request a trial by jury on all claims for which it is available.

January 10, 2017                                    Respectfully submitted,

By: */s/ Stephen A. Weisbrod*
Stephen A. Weisbrod
John G. Koch
Weisbrod Matteis & Copley PLLC
1200 New Hampshire Avenue, NW
Suite 600
Washington, DC 20036
(202) 499-7909
sweisbrod@wmclaw.com
jkoch@wmclaw.com

- 26 -